UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In Re:

    New York's Premier Group LLC          Chapter 11
                                                Case No. 24-
                            Debtor.

## DECLARATION OF JOHNATHAN
## IN SUPPORT OF FIRST DAY RELIEF AND PETITION

I, Johnathan Vincent, hereby declare the following under penalty of perjury:

1.     I am CEO and Sole Member of the Debtor in the above-captioned proceeding.

2.     The Debtor was formed on February 17, 2021 and began doing business thereafter.

3.     The Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of Tile 11 of the United States Code (hereinafter the "Bankruptcy Code") on November 25, 2024.

4.     I submit this declaration to assist this Court and the parties-in-interest in understanding: (a) the circumstances leading to the commencement of this Chapter 11 case; (b) the business structure of the Debtor; and (c) the Debtor's prepetition debt.

5.     Additionally, I submit this declaration in support of: (a) the Debtor's petition for relief under the United States Bankruptcy Code; and (b) the "first day" relief the Debtor has requested pursuant to the motions and applications also filed on the date hereof.

6.     Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge as Managing Member and President. If called upon to testify, I would testify competently to the facts set forth herein.

## Background

7.     The Debtor was formed in February, 2021.

8. As of the Petition date, the Debtor employs nine (9) employees. Employees are paid a mix of hourly rates, salaries, and commissions, depending on the employee and their job functions. Debtor's Managing Member, Johnathan Vincent, is paid through periodic owner draws. Debtor's average monthly payroll varies between "busy" and "slow" seasons, but is approximately $90,000.00 inclusive of relevant tax and other withholdings.

9. Debtor anticipates needing to maintain its workforce during the course of reorganization, but, as of the time of filing, is assessing its fleet of vehicles as well as employment structure to identify ways to reduce overhead.

10. The Debtor's revenue is derived from fees earned from roofing, siding, and window contracting.

11. As of the Petition Date, the Debtor's combined assets aggregate approximately $990,000.00. The Debtor's combined liabilities aggregate approximately $1,980,500.00, with approximately $661,500.00 in secured debt (not accounting for bifurcation or undersecured positions of said debts), $16,000.00 in priority wage claims, and $1,303,000.00 in general unsecured debt.

## Events Leading up to Chapter 11

12. In or around October 2024, the Debtor retained Boyle Legal, LLC ("Boyle") to assess its financial situation and make a recommendation as to whether filing for bankruptcy protection would be in the best interest of the Debtor, its clients, and its creditors. Ultimately, Boyle and the Debtor's management determined that seeking protection under chapter 11 of the Bankruptcy Code would be the best means for the Debtors to obtain relief from its numerous debts and allow it to successfully restructure its business debt payments through either reducing its business offerings, and thus reducing overhead, or through liquidating its business and reducing

maximizing liquidation payouts to its creditors.

13. Debtor provides roofing contracting services to both commercial and residential clients.

14. Historically, Debtor has had strong cashflow and revenues, grossing over one million two hundred thousand dollars ($1,200,000.00) in 2022 and nearly four million nine hundred thousand dollars ($4,900,000.00) in 2023.

15. As of November, 2024, Debtor has grossed approximately five million dollars ($5,000,000.00).

16. Debtor's major financial concerns began in 2023, when Debtor was pursuing private equity investment. At that time, on the advice of private equity, Debtor began "bulking up" in order to increase revenues and to appear more desirable for private equity financing.

17. Ultimately, private equity financing failed to materialize during due diligence.

18. Debtor attempted to "float" it's beefed up operations and mitigate the sharp increase in operational costs by pursuing traditional financing; however, same was not fast enough based on Debtor's immediate needs.

19. As such, to meet the demands of its overhead, Debtor participated in multiple transactions with various MCA ("Merchant Cash Advance") entities.

20. Debtor went the MCA route after trying, and failing, to secure traditional financing.

21. Debtor's goals in this bankruptcy are to maintain necessary secured equipment (namely, trucks and trailers), surrender superfluous equipment, and maintain and grow its contracts in order to cashflow positive and survive the restructuring process.

22. Debtor believes based on its current workload, that it can successfully restructure; however, Debtor requires immediate bankruptcy relief in order to keep its creditors at bay while

it formulates a plan of reorganization.

**The First Day Motions**

a.      **Application to Shorten Time**

11.    Pursuant to its Application to Shorten Time, the Debtor seeks an order allowing its First Day Motions to be heard on shortened notice.

12.    A shortened notice period is essential to maintaining the viability of the Debtor's business given the ongoing business obligations it has including: cash collateral, insurance, payroll, and banking practice considerations.

b.      **Motion of Debtor for an Order Authorizing Continuation of Various Insurance Policies and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection, if any, therewith and Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy Without First Obtaining Relief from the Automatic Stay**

13.    The nature of Debtor's operations makes it essential to maintain adequate insurance programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under any of the Debtor's insurance programs could result in cancellation of existing policies, declining to renew insurance policies or refusing to enter into new insurance agreements in the future.

14.    In the ordinary course of its business, the Debtor maintains insurance policies, including: general liability, automotive, and workers' compensation, disability.

15.    The Debtor pays approximately $5,150.00 monthly for these ongoing insurance policies. In addition, in the ordinary course of business, retroactive adjustments are occasionally made with respect to the insurance policies. The insurance policies are paid in monthly installments and are renewed annually in the ordinary course of business.

16.    Based upon the Debtor's need for insurance coverage in the operation of their business,

the Debtor respectfully requests the Court allow it to continue to pay these amounts as an ongoing concern.

**c.  Motion of Debtor for Entry of Interim Order Authorizing Continued Use of Existing Bank Accounts**

17. In the ordinary course of business, Debtor maintains its business bank accounts with Balston Spa National Bank, Chase Bank, and NBT Bank, N.A.

18. I understand NBT Bank, N.A. is an approved depository of the United States Trustee's office.

19. I also understand that upon the filing of a petition for relief, a Debtor-in-Possession traditionally establishes all new Debtor-in-Possession bank accounts.

20. I would respectfully request the Court allow the Debtor to maintain its bank accounts with NBT N.A. as a shutdown of same would interrupt significant services and financial transactions of the Debtor.

21. Debtor proposes to maintain its bank accounts with NBT and to have NBT designate same as Debtor-in-Possession accounts pursuant to the operating guidelines set down by the United States Trustee's Office.

22. Debtor fears that interruption of this *status quo* will result in irreparable harm to the Debtor and its ability to maintain ongoing operations.

23. Debtor's largest source of revenue (Foundation Finance) pays Debtor electronically. Forcing Debtor to immediately change bank accounts could lead to further delay in Debtor's receipt of outstanding receivables at a time when Debtor is strapped for cash. Debtor needs to avoid interruption to ongoing cashflow during this process.

24. Additionally, authorization to continue to maintain its payroll account will help maintain

trust in Debtor by its workforce and commitment by and between the Debtor and its Employees.

25. Should the Debtor need to shut down its existing accounts immediately, Debtor's workforce and ongoing concern vendors will most certainly be prejudiced by the delay in payment of their post-petition amounts due and Debtor's receipt of ongoing accounts receivables will be stymied.

**d.    Motion to Utilize Cash Collateral**

24. At the time of filing, Debtor's cash and cash equivalents are purportedly encumbered by various MCA entities. Debtor respectfully reserves its rights to determine the nature, extent, and validity of any and all of it's purported cash collateral creditors.

25. Upon information and belief, Toro, LLC, is in first position with Debtor's collateralized cash and are owed approximately $2,465.00.

26. Upon information and belief, Bluevine Inc. is in second position with Debtor's collateralized cash and are owed approximately $97,605.00.

27. Upon information and belief, Channel Partners Capital, LLC is in third position with Debtor's collateralized cash and are owed approximately $91,122.00.

28. Upon information and belief, Insta Funding, LLC is in fourth position with Debtor's collateralized cash and are owed $80,000,00.

29. Upon information and belief, Main Street Merchant Services, Inc. is in fifth position with Debtor's collateralized cash and are owed $10,000.00.

30. Upon information and belief, Capytal.com is in sixth position with Debtor's collateralized cash and are owed $45,000.00.

31. Upon information and belief, Quid Holdings is in seventh position with Debtor's

collateralized cash and are owed $68,000.00.

32. At the time of filing, Debtor's cash equivalent at the time of filing is approximately $696,776.97.00. Of that amount, Debtor is in possession of approximately $51,000.00 in its bank accounts. The remainder is accounts receivable owed to Debtor with $361,000.00 under 90-days due and $284,000.00 over 90-days due. As such, Debtor has no unencumbered cash as of the time of filing; however, Debtor believes that it will be able to expeditiously collect on its open receivables to maintain ongoing operations.

33. It is absolutely essential for Debtor's short- and long-term ongoing operations to be able to utilize its cash on hand and collected receivables in order to maintain post-petition obligations, including payroll, insurance payments, and operating costs/overhead.

34. Without access to this cash, Debtor cannot survive.

35. Debtor has proposed ongoing adequate protection payments to its purported Cash Collateral Creditors in the form of ongoing monthly payments.

36. As such, equity dictates that Debtor be able to utilize cash collateral to cover necessary and reasonable ongoing expenses, certain pre-petition prioritized expenses, and that the adequate protection proposed and articulated by Debtor in its motion to use cash collateral, is sufficient to protect the interests of Debtor's secured Creditors.

e. **Motion to Pay Prepetition Workforce Claims**

34. In the ordinary course of business, Debtor employs nine employees, compensated at mixed rates of salary, hourly wages, and commissions.

35. Debtor also relies on a limited number of specialized, Subcontractors (approximately eight).

36. The Debtor pays its employees one week in arrears. For example, the last paycheck issued by Debtor to its employees covered a wage period ending November 16, 2024, with the pay being processed and paid to the employee on November 22, 2024.

37. As such, as of the time of filing, Debtor owes its employees for waged earned from November 17, 2024 until the Petition Date.

38. Debtor's workforce is small, specialized, and critical for the survival of its current ongoing operations.

39. Debtor's employees are loyal and hardworking and it is critical Debtor be granted the ability to pay them for their modest pre-petition services.

40. No employee is owed more than the prioritized wage limit.

41. Additionally, Debtor seeks authorization to pay its subcontractors as an ongoing concern. Again, it is a combination of their efforts and the efforts of Debtor's employees that has allowed Debtor to achieve the revenue growth it's seen over the past three years.

42. Debtor believes it can replicate and grow off of this success; however, it cannot do so without both its employees and subcontractors at the helm.

**f.    Application to Employ Boyle Legal**

43. Debtor desires to employ Boyle Legal, LLC to represent its interest in this Proceeding. Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:        November 24, 2024             /s/Johnathan Vincent
                                             Johnathan Vincent, Sole Member
                                             *New York's Premier Group, LLC*
                                             Debtor and Debtor-in-Possession